**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | | |
|---|---|---|
| IN RE | : | |
| | : | **Chapter 13** |
| **MICHAEL W. TOMLIN,** | : | **Case No. 15-20852** |
| | : | **Judge Tracey N. Wise** |
| Debtor. | : | |
| ———————————————— | : | |
| | : | |
| **MICHAEL W. TOMLIN,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | **Adversary No. 15-2029** |
| vs: | : | |
| | : | |
| **THE BANK OF NEW YORK MELLON,** | : | |
| et al., | : | |
| | : | |
| Defendant. | : | |
| ———————————————— | : | |

**MEMORANDUM OPINION AND ORDER**

In this adversary proceeding, pro se Plaintiff/Debtor, Michael W. Tomlin ("Tomlin")

asserts causes of action for defamation, violations of the Fair Credit Reporting Act, 15 U.S.C.

§ 1681, *et seq.* ("FCRA" or "Act"), breach of contract, fraud, intentional infliction of emotional

distress, and tortious interference with contractual relationships against multiple defendants.[1]

Tomlin bases his causes of action on allegations that the defendants (i) furnished false, erroneous

or unsubstantiated negative credit reports to credit reporting agencies regarding Tomlin, (ii) failed

to correct such inaccurate reports, including failing to furnish positive reports when Tomlin made

payments, (iii) filed unwarranted foreclosure actions against Tomlin, (iv) made false reports to his

---

[1] Tomlin also asserts a claim for perjury based on the same facts as one of his fraud claims.   As noted below, there is
no private right of action for perjury and such claim is treated as a fraud claim.

homeowner's insurer, and/or (v) fraudulently induced Tomlin to enter into a settlement agreement and then breached the settlement agreement.

Two defendants, Bank of New York Mellon, as Successor in interest to JPMorgan Chase Bank as Trustee for the registered holders of NovaStar Mortgage Funding Trust 2004-3 NovaStar Home Equity Loan Asset-backed Certificates, Series 2004-3 ("BONY") and Ocwen Loan Servicing, LLC ("Ocwen" and together with BONY, the "BONY Defendants") jointly filed a Motion to Dismiss Adversary Complaint [ECF No. 26] ("Motion to Dismiss") on the bases that:

1.   The Complaint fails to state a claim upon which relief can be granted;

2.   Tomlin's causes of action for violation of the FCRA are precluded by the statute of limitations set forth therein at § 1681p;

3.   Tomlin's state law causes of action are preempted by the FCRA and/or barred by the applicable state statutes of limitation; and

4.   The Complaint should be dismissed as "an impermissible shotgun pleading."

A hearing on the Motion to Dismiss was held on October 13, 2015, and the matter was taken under submission.

The other two other defendants, Saxon Mortgage Services, Inc. ("Saxon") and Rosio Duran ("Duran" and together with Saxon, the "Saxon Defendants") filed a joint Motion for Summary Judgment [ECF No. 51] and Memorandum in Support of Motion for Summary Judgment [ECF No. 53] ("Saxon Memorandum") on the bases that:

1.   Tomlin's causes of action for violation of the FCRA are precluded by the Act's statute of limitations, 15 U.S.C. § 1681p, and/or he does not have a private right of action to bring those claims; and

2.   Tomlin's state law causes of action are preempted by the FCRA, barred by the state

statutes of limitation, and/or have been released and are barred by the doctrine of *res judicata*.[2]

The Motion for Summary Judgment has been fully briefed, and the Court having

determined that oral argument is not necessary, is also ripe for decision.

## JURISDICTION

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b).   The allegations

against BONY, Ocwen, Saxon and Duran (collectively, the "Defendants") are related-to, non-core

proceedings which this Court is authorized to hear.   28 U.S.C. § 157(c)(1).   Tomlin and the

Saxon Defendants expressly consent to this Court entering final orders and judgments.   28 U.S.C.

§ 157(c)(2).   The Court will order the BONY Defendants to state whether they consent to entry of

final orders and judgments by this Court.   FED. R BANKR. P. 7012(b).   Venue is proper pursuant

to 28 U.S.C. § 1409.

## MOTION TO DISMISS STANDARD

The BONY Defendants asserts that the Complaint fails to state a claim upon which relief

can be granted and accordingly should be dismissed as to them pursuant to Federal Rule of Civil

Procedure 12(b)(6), made applicable in adversary proceedings pursuant to Federal Rule of

Bankruptcy Procedure 7012(b).[3]

Civil Rule 8(a)(2), made applicable in adversary proceedings pursuant to Bankruptcy Rule

7008(a), requires "a short and plain statement of the claim showing that the pleader is entitled to

relief."   In analyzing the pleading requirements of Civil Rule 8(a)(2) in connection with a Civil

Rule 12(b)(6) motion to dismiss, the Supreme Court has stated, "[t]o survive a [Civil Rule

---

[2] The BONY Defendants also assert that some of the claims against them are barred by claim preclusion or *res judicata*; however, they further state that "the basis for those defenses is not evident from the face of Plaintiff's Complaint and are thus not argued at the motion to dismiss stage."   [Mot. to Dismiss 20, n.76.]

[3] Hereinafter references to the Federal Rules of Civil Procedure will appear as "Civil Rule ___" and reference to the Federal Rules of Bankruptcy Procedure will appear as "Bankruptcy Rule ____."

12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A pleading that offers

'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'

Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhance-

ment.'"   *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).   In defining the "plausibility" standard, the

Supreme Court stated,

> A claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged.   The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a defendant has acted
> unlawfully.   Where a complaint pleads facts that are "merely consistent with" a
> defendant's liability, it "stops short of the line between possibility and plausibility
> of 'entitlement to relief.'"
>
> . . . .
>
> In keeping with these principles a court considering a motion to dismiss can
> choose to begin by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.   While legal conclusions
> can provide the framework of a complaint, they must be supported by factual
> allegations.   When there are well-pleaded factual allegations, a court should
> assume their veracity, and then determine whether they plausibly give rise to an
> entitlement to relief.

*Id.* at 678-79 (citations omitted) (quoting *Twombly*, 550 U.S. at 556, 557).   Thus, as to each count,

the Court must determine whether the Complaint contains sufficient factual matter as to each

element necessary to state a claim to relief that is plausible on its face.

> In determining whether a complaint states a plausible claim for relief, the Court
> may consider the facts alleged in the pleadings, documents attached as exhibits or
> incorporated by reference in the pleadings, and matters of which the Court may
> take judicial notice.

*Haney v. Educ. Credit Mgmt. Corp. (In re Haney)*, Ch. 13 Case. No. 97-70937, Adv. No. 11-7024,

2011 WL 6000886, at *2 (Bankr. E.D. Ky. Nov. 30, 2011) (citations omitted), *appeal dismissed as*

*untimely*, 2012 WL 3683533 (E.D. Ky. Aug. 27, 2012).

Including the contracts with [defendant's] motion to dismiss did not convert that motion into a motion for summary judgment under Federal Rule of Civil Procedure 12(d) because [plaintiff] expressly referenced those contracts in its complaint. *See Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.") (citing *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir. 2001)).

*Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 n.1 (6th Cir. 2012).

The BONY Defendants assert that certain of Tomlin's claims are preempted by the FCRA or barred by various state statutes of limitation—both of which are affirmative defenses. FED. R. CIV. P. 8(c)(1) (affirmative defenses include statutes of limitations); *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 674-75 (6th Cir. 2013) (federal preemption is affirmative defense). Tomlin is not required to negate affirmative defenses in his Complaint. However, a motion filed pursuant to "Rule 12(b)(6) will be granted if . . . the claim shows on its face that relief is barred by an affirmative defense." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 513 (6th Cir. 2010).

Further, although the statute of limitations and *res judicata* are affirmative defenses, "[i]n an appropriate case, an affirmative defense may be adjudicated on a motion to dismiss for failure to state a claim." In particular, dismissal on the basis of an affirmative defense is appropriate where "the facts that establish the defense [are] definitively ascertainable from the allegations of the complaint, the documents (if any) incorporated therein, matters of public record, and other matters of which the court may take judicial notice," and "the facts so gleaned . . . conclusively establish the affirmative defense."

*Hudson v. Genesee Intermediate Sch. Dist.*, No. 14-11939, 2015 WL 128030, at *2 (E.D. Mich. Jan. 8, 2015) (alterations in original) (quoting *Banco Santander De Puerto Rico v. Lopez-Stubbe (In re Colonial Mortg. Bankers. Corp.)*, 324 F.3d 12, 16 (1st Cir. 2003)); *see also La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004) ("a Rule 12(b)(6) dismissal on statute of

limitations grounds is appropriate only if it is apparent from the face of the complaint that the

claim is time-barred." (citation omitted) (internal quotation marks omitted)).

**BACKGROUND AND FACTS ALLEGED IN THE COMPLAINT
AND EXHIBITS TO COMPLAINT**

I.      <u>The Defendants</u>.

   The Complaint alleges the roles of the Defendants as follows.   Although Tomlin alleges

BONY has never established its rights therein, BONY asserts it is the current owner of the Note

described below.   The date BONY acquired the Note is not alleged in the Complaint or exhibits

thereto, but the events giving rise to the allegations against BONY started in October 2007.

Saxon serviced the Note for BONY from October 2007 through May 2011.   In May 2011, Ocwen

began servicing the Note for BONY.   Other than naming Duran as a Defendant and resident of

Texas, the Complaint is devoid of any mention of Duran.[4]

II.      <u>Events Prior to the Involvement of the Named Defendants</u>.

   On June 19, 2004, Tomlin executed a promissory note in favor of NovaStar Mortgage,

Inc.[5] ("NovaStar") in the amount of $126,000.00 with interest at 8.9508 percent per annum

("Note").   [Compl. Ex. J at 7, ECF No. 1.]   The Note was secured by a mortgage on real estate

located at 912 Shayler Avenue, Deland, Florida ("Property").   On May 15, 2007, NovaStar filed a

foreclosure action against Tomlin in the Circuit Court of Volusia County, Florida.   On

September 19, 2007, Tomlin and NovaStar entered in a Loan Modification Agreement [Compl.

Ex. B] increasing the Note's interest rate to 10.95 percent per annum and providing monthly

---

[4] Duran's role is clarified in the Saxon Memorandum and Duran treats the allegations in paragraphs 121 and 132 as if they are asserted against him.   Thus, the Court does likewise for purposes of the Motion for Summary Judgment discussed below.

[5] All allegations in the Complaint relating to the original lender are against an entity named NovaStar Financial, Inc. However, NovaStar Mortgage, Inc. is the entity named in the exhibits attached to the Complaint, and NovaStar Financial, Inc.'s role in these matters is not explained.   Neither NovaStar Mortgage, Inc. nor NovaStar Financial, Inc. is a defendant in this adversary proceeding.

6

payments of principal and interest of $1,183.08.   Tomlin alleges that on September 25, 2007, he

received notification from NovaStar that under the modification an escrow shortage of $3,842.86

was being prorated over sixty months and beginning November 1, 2007, his monthly payments for

principal, interest and escrow would be $1,373.34.   [Compl. Ex. B.]

**III.**   **Allegations against BONY and Saxon**.

In October 2007, Saxon began servicing the Note.   Tomlin received his first loan

statement from Saxon in November 2007.   That statement reflected Tomlin's monthly payment

was $1,552.85, instead of the expected $1,373.34, and "also reflected a large and unsubstantiated

shortage in excess of 7K payable immediately."   [Compl. ¶ 20.]   Tomlin alleges that he contacted

Saxon and was advised that Saxon did not have to adhere to the terms of the Loan Modification

Agreement.   Thereafter through March or April 2008, Saxon's statements continued to reflect

payments due of $1,552.85 and Tomlin continued to make monthly payments of $1,373.34.

Tomlin, acknowledging that his payments were not always timely, states that he added a fee of

$25.29, which was NovaStar's customary late fee, if and when his payments were late.   [Compl.

¶ 22.]   Tomlin also acknowledges his mortgage payment for February 2008 was returned due to

insufficient funds.   [Compl. ¶ 27.]   He alleges, however, that on March 18, 2008, he resent his

February 2008 payment and on March 20, 2008, resent his March 2008 payment to Saxon.

[Compl. ¶¶ 28-29.]   According to Tomlin, Saxon misapplied these and other payments and the

statement dated April 17, 2008, incorrectly reflected that his account was past due $5,061.34.

In May 2008, BONY filed a foreclosure action against Tomlin in the Circuit Court for

Volusia County, Florida, No. 2008-118959-CIDL ("BONY 2008 Foreclosure").[6]   Tomlin alleges

---

[6] In the BONY 2008 Foreclosure, BONY stated that the Note and related mortgage were assigned to it but that the originals of those documents were lost.   BONY requested the state court "re-establish" the Note and mortgage pursuant to Florida Statutes § 673.3091.   [Compl. Ex. E, at 8.]

that his account was not in default when this foreclosure action was filed and that he advised Saxon

of the discrepancies.

Tomlin further alleges that during the period from November 2007 and continuing through

January 2009, Saxon and BONY made negative credit reports regarding his payments and the

BONY 2008 Foreclosure.   He alleges the negative reports were unsubstantiated and unwarranted

because he was making payments pursuant to the Loan Modification Agreement.

On June 2, 2009, Tomlin and his wife, Marilyn B. Tomlin, filed a complaint against BONY

and Saxon in the Circuit Court for Volusia County, Florida, No. 2009-12564-CIDL ("Tomlin

Lawsuit") for their allegedly fraudulent actions.   On October 6, 2009, after court-ordered

mediation, the parties entered into a settlement agreement which provides:

> 1.   Defendant agrees to modify Plaintiff's loan as follows: (1) Rate reduction/
> freeze of 7.00% through the life of the loan; (2) Plaintiff shall pay the amount of
> $3681.68 in certified funds by November 15, 2009; (3) First payment of $878.20
> shall be due by 12/1/09; (4) Defendant shall henceforth not require escrow
> payments for property tax and insurance *as long as those are paid directly by
> Plaintiff*; (5) Balloon payment of $18,681.69 due on July 1, 2034; (6) No
> prepayment penalty; (7) Plaintiffs shall return the executed loan modification
> documents prepared by Defendant to Defendant by 11/1/09 or sooner if possible;

> 2.   Plaintiffs shall dismiss this case with prejudice as to each Defendant named
> therein with pleading prepared by counsel for Defendant providing that each party
> shall bear his/her/its own attorney fees and costs; Plaintiffs shall further execute a
> Release of all claims and Confidentiality Agreement prepared by counsel for
> Defendant.   All parties hereto shall be dismissed with prejudice.

> 3.   Defendants shall dismiss the pending foreclosure on the real property in
> question in this case upon the completion of items (1) and (2) above.   Said
> dismissal shall specify that each party to the foreclosure shall bear his/her/its own
> costs and attorney fees.

> 4.   It is the intention of the parties that there should be no further claims made
> by any of them against any of the others of them for anything which could be a
> claim as of this date unless separately set forth herein.

> 5.   Each party agrees to separately and severally . . . pay his, her or their
> attorneys fees and court costs incurred in this matter, and also his, her or their
> proportionate share of the mediator's fee.

>    6.   PLAINTIFF AND DEFENDANT ACKNOWLEDGE THAT ALL OF
> THEIR AGREEMENTS, AND EVERY PART OF EVERY AGREEMENT
> REACHED BY THEM IS STATED HEREINABOVE.

[Compl. Ex. I (first emphasis added) [hereinafter "2009 Settlement Agreement"].]   Tomlin asserts

that "[a]s part of the Settlement Agreement Mr. Tomlin would not have an escrow account, and

[BONY], by way of its mortgage servicing company would correct errors on Mr. Tomlin's credit

report."   [Compl. ¶ 50.]

Tomlin asserts that from October 2009 through February 2010, BONY and Saxon

breached the 2009 Settlement Agreement by not reporting to the credit agencies that he was

making his mortgage payments.   Tomlin alleges they further breached the 2009 Settlement

Agreement by paying Tomlin's property tax and imposing an escrow agreement.   [Compl.

¶¶ 51-52.]

On February 12, 2010, Tomlin filed a motion in the Florida Tomlin Lawsuit to enforce the

2009 Settlement Agreement and requested the appointment of a trustee to oversee its enforcement.

He alleges that in April 2010, BONY and/or Saxon provided him with an affidavit ("Duran

Affidavit")[7] that the credit reporting errors had been corrected but when he later checked his credit

report, the errors had not been corrected.   [Compl. ¶ 54.]

On April 26, 2010, an order ("State Enforcement Order") was entered in the Tomlin

Lawsuit enforcing the 2009 Settlement Agreement.   [Compl. ¶ 55.][8]   Tomlin further alleges that

on May 21, 2010, "[n]ow that a settlement agreement is in place and the judge has enforced it, Mr.

Tomlin filed his notice of voluntary dismissal which ended the [Tomlin Lawsuit]."   [Compl.

---

[7] The Saxon Memorandum clarifies that the affidavit referred to here was executed by Duran during his employment with Saxon as a mediation specialist.   [Saxon Mem. Ex. 1 ¶ 5, ECF No. 53-1; *see also* ECF No. 53-4.]

[8] A copy of the State Enforcement Order was not attached to the Complaint but was attached to Tomlin's reply to the Motion to Dismiss.   [*See* Obj. to Defs.' Mo. Dismiss Adv. Compl. Ex. A, ECF No. 33].   Because the State Enforcement Order is referred to in the Complaint, is central to the claims asserted therein, is a matter of public record, and is a matter of which this Court can take judicial notice, this Court finds that it is appropriate to consider the State Enforcement Order in the context of the Motion to Dismiss.   *See Northampton Rest. Grp.*, 492 F. App'x at 522 n.1; *Hudson*, 2015 WL 128030, at *2; *In re Haney*, 2011 WL 6000886, at *2.

¶ 56.]   Tomlin asserts that he relied on the Duran Affidavit in making his decision to dismiss the Tomlin Lawsuit.   [Compl. ¶ 121.4.]

In October 2010, Tomlin alleges that because of BONY's failure to correct his credit reports, he was denied a loan for a real estate project in California.   [Compl. ¶ 57.]

Finally, Tomlin alleges that BONY and Saxon interfered with his ability to keep or obtain homeowner's insurance on the Property by communicating to his insurer in January 2008 and February 2009 that the Property was vacant and subject to foreclosure or bankruptcy.   [Compl. ¶¶ 128, 130.]   In Spring 2011, Tomlin again received notice from his insurer that his homeowner's policy was being cancelled due to a foreclosure when there was no foreclosure. [Compl. ¶ 129.]

## IV.    <u>Allegations against BONY and Ocwen</u>.

In May 2011, Ocwen began servicing the Note.   Tomlin's allegations against Ocwen begin in August 2011, when he started receiving payment notifications from Ocwen for amounts in excess of the $878.00 set forth in the 2009 Settlement Agreement.   The increase in payment was initially $55.00 for escrow to cover insurance and taxes on the Property which Tomlin asserts were improper because under the 2009 Settlement Agreement, there was no escrow account.   Tomlin made the August and September 2011 payments in the amount of $878.00 and then refused to make the October-December 2011 payments as he alleges Ocwen refused to acknowledge the 2009 Settlement Agreement.   In December 2011, Tomlin brought the loan current according to Ocwen's accounting to avoid foreclosure.   Thereafter, Tomlin alleges that Ocwen again increased his payment by $133.00 per month without explanation.

On May 10, 2012, BONY filed a second foreclosure action against Tomlin in the Circuit Court for Volusia County, Florida ("BONY 2012 Foreclosure").   Tomlin alleges that this case was dismissed on September 11, 2012, due to lack of standing.   The order allegedly dismissing

the case is not in the record and on November 25, 2014, BONY filed an amended complaint in the

BONY 2012 Foreclosure.

On June 23, 2015, Tomlin filed his chapter 13 petition in this Court and on July 17, 2015,

he filed this adversary proceeding.

## LAW AND ANALYSIS

### I.    The Complaint Will Not Be Dismissed as a "Shotgun Complaint".

Prior to addressing the specific allegations against them, the BONY Defendants assert that

the Complaint should be dismissed as an incomprehensible "shot gun" pleading.

> The typical shotgun complaint contains several counts, each one incorporating by
> reference the allegations of its predecessors, leading to a situation where most of
> the counts (i.e., all but the first) contain irrelevant factual allegations and legal
> conclusions.   Consequently, in ruling on the sufficiency of a claim, the trial court
> must sift out the irrelevancies, a task that can be quite onerous.

*Strategic Income Fund v. Spear, Leeds & Kellog*, 305 F.3d 1293, 1295 (11th Cir. 2002).

> Shotgun pleadings, whether filed by plaintiffs or defendants, exact an
> intolerable toll on the trial court's docket, lead to unnecessary and unchannelled
> discovery, and impose unwarranted expense on the litigants, the court and the
> court's parajudicial personnel and resources.   Moreover, justice is delayed for the
> litigants who are "standing in line," waiting for their cases to be heard.

*Cramer v. Florida*, 117 F.3d 1258, 1263 (11th Cir. 1997).

BONY is correct that the Complaint contains several counts and each one incorporates all

of the preceding paragraphs rather than just the factual allegations of the Complaint.   Further, the

Complaint does not always clearly specify the Defendant against whom each count is alleged.

However, the specific allegations supporting each claim and the party responsible for the actions

asserted are restated in those specific claims.   A shotgun pleading "is problematic when it is

'virtually impossible to know which allegations of fact are intended to support which claim(s) for

relief.'"    *Degirolamo v. McIntosh Oil Co. (In re Laurel Valley Oil Co.)*, Ch. 7 Case No. 05-64330,

Adv. No. 12-6014, 2012 WL 2603429, at *2 (Bankr. N.D. Ohio July 5, 2012) (quoting *Peavey v.*

11

*Black*, No. 11-13925, 2012 WL 986801, at *2 (11th Cir. Mar. 23, 2012)).   While not the easiest

Complaint to follow, it is not "virtually impossible" to determine Tomlin's claims and the

Defendants involved.

Further, the remedy for a shotgun complaint—at least the first time this argument is

raised—is generally not dismissal, but to require the plaintiff to replead their claims.   *Morris v.*

*Zelch (In re Reg'l Diagnostics, LLC*, 372 B.R. 3, 21 n.76 (Bankr. N.D. Ohio 2007) (relegating

"shotgun complaint" argument to a footnote and stating that defendants cite no Sixth Circuit

precedent on the issue, it was far from clear that complaint therein was deficient on that ground,

and remedies in case cited by defendant did not include dismissal); *Magluta v. Samples*, 256 F.3d

1282 (11th Cir. 2001) (remanding to district court to require plaintiff to replead his claims against

fourteen public officials where complaint was fifty-eight pages, all defendants were charged in

each count, and there was no distinction as to which official engaged in specific conduct);

*Strategic Income Fund*, 305 F.3d 1293 (discussing burden on courts and problems with "shotgun

complaint" and affirming dismissal of third amended complaint that was still "shotgun

complaint").

The Complaint will not be dismissed as an impermissible "shotgun complaint."

## II.      Fair Credit Reporting Act Claims.

The Defendants assert that Tomlin's claims against them for violation of the FCRA are

barred by the Act's statute of limitations or, as to the Saxon Defendants, that Tomlin does not have

a private right of action with respect to his FCRA claims.   The Defendants further allege that

most, if not all, of Tomlin's state law claims are preempted by the FCRA.   Thus, resolution of

these issues requires a detailed analysis of the FCRA.

> While the outcome [of many claims] in this case is ultimately achieved by applying
> the statute's provisions in a step-by-step fashion as the statute requires, the Court

thinks the complexity of this task is aided by reviewing the FCRA's purpose, scope, and general framework.

*Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 781 (W.D. Ky. 2003).

    A.  <u>FCRA's purpose, scope and general framework</u>.

        It is the purpose of [the FCRA] to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

15 U.S.C. § 1681(b).   "Thus, the FCRA is aimed at protecting consumers from inaccurate information in consumer reports and at the establishment of credit reporting procedures that utilize correct, relevant, and up-to-date information in a confidential and responsible manner."   *Jones v. Federated Fin. Reserve Corp*., 144 F.3d 961, 965 (6th Cir. 1998).   "[T]he FCRA is to be liberally construed in favor of the consumer."   *Id.* at 964.

    B.  <u>Defendants' responsibilities as "furnishers" under the FCRA</u>.

    FCRA § 1681s-2, titled "Responsibilities of furnishers of information to consumer reporting agencies," sets forth the Defendants' obligations as "furnishers"[9] of credit information. Briefly, those obligations require that (i) the furnisher provide accurate information, and (ii) upon receipt of notice *by a consumer reporting agency* of a dispute as provided in § 1681i(a)(2), the furnisher must investigate the dispute, report the results to the consumer reporting agency and, if the information provided is found to be inaccurate or incomplete, take corrective action as set forth in the statute.   15 U.S.C. § 1681s-2(a), (b).

---

[9]  The term "furnisher" is not defined in the FCRA.   However, Tomlin alleges and the Defendants do not contest that they are "furnishers" as that term is used in the FCRA.

1. *There is no private cause of action for violations of § 1681s-2(a) (inaccurate credit reports)*.

Tomlin's allegations that the Defendants, as furnishers, provided inaccurate information to credit reporting agencies in violation of § 1681s-2(a) must be dismissed.   Courts have consistently held that the remedies for violations of § 1681s-2(a) are limited by subsections (c) and (d) thereof, which provide for enforcement only by government officials.   *Morgan v. HSBC Mortg. Servs., Inc.*, 930 F. Supp. 2d 833, 837 (E.D. Ky. 2013) (no private cause of action exists under § 1681s-2(a)).

> More precisely, subsection (c) eliminates the availability of direct remedies to consumers by making §§ 15 U.S.C. 1681n and 1681*o*—the FCRA's broad provisions creating civil liability for willful and negligent noncompliance respectively—inapplicable to violations of subsection (a).   Subsection (d) provides that the requirements imposed by subsection (a) are only enforceable by government officials.

*Stafford*, 262 F. Supp. 2d at 782-83 (footnotes omitted); *see e.g.*, *Purcell v. Bank of Am.*, 659 F.3d 622, 623 (7th Cir. 2011).   Tomlin's asserted § 1681s-2(a) private causes of action based on allegations that inaccurate credit reports were provided by the Defendants fail to state a claim upon which relief can be granted and will be dismissed.

2. *Tomlin's claims for violations of § 1681s-2(b) (failure to investigate and correct inaccurate reports upon notice of dispute) fail to state a claim upon which relief can be granted*.

Tomlin's § 1681s-2(b) claims based on allegations that the Defendants failed to correct inaccurate information, must be dismissed.

Section 1681s-2(b) provides:

> (b) Duties of furnishers of information upon *notice of dispute*
>> (1) In general
>> *After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—*
>>> (A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) *if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and*

(E) *if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—*

> *(i) modify that item of information;*

> *(ii) delete that item of information; or*

> *(iii) permanently block the reporting of that item of information.*

(2) Deadline

A person shall complete all investigations, reviews, and reports required under paragraph (1) regarding information provided by the person to a consumer reporting agency, before the expiration of the period under section 1681i(a)(1) of this title within which the consumer reporting agency is required to complete actions required by that section regarding that information.

15 U.S.C. § 1681s-2(b) (emphasis added).   Contrary to violations of subsection (a), consumers have a private right of action for violations of subsection (b) of § 1681s-2.   "Virtually all courts considering this issue are in agreement."   *Stafford*, 262 F. Supp. 2d at 783 & n.4 (collecting cases).   However, a furnisher's responsibility to investigate and then correct any inaccurate information, does not arise unless and until the furnisher has received notice as required by § 1681i(a)(2)[10] which requires that the *consumer reporting agency* provide the notice of dispute to

---

[10]   Section 1681i(a)(2) provides:

(2) Prompt notice of dispute to furnisher of information.—

(A) In general.—Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), *the agency shall provide notification* of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person.   The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.

(B) Provision of other information.—The *consumer reporting agency shall promptly provide* to

the furnisher.   "This means that a furnisher of credit information, such as the [Defendants herein],

ha[ve] no responsibility to investigate a credit dispute until *after* it receives notice from a consumer

reporting agency.   Under the statutory language, *notification from a consumer is not enough*."

*Stafford*, 262 F. Supp. 2d at 784 (emphasis added); *see also Brown v. Wal-mart Stores, Inc.*, 507 F.

App'x 543, 547 (6th Cir. 2012) ("A private cause of action [under § 1681s-2(b)] against a

furnisher of information does not arise until a consumer reporting agency provides proper notice of

a dispute" and plaintiff's allegations that he directly informed defendants of his dispute did not

obligate them to investigate); *Morgan*, 930 F. Supp. 2d at 837-38 (quoting *Stafford* and finding

that where complaint failed to allege furnisher of information received notice of plaintiff's dispute

from *credit reporting agency*, the duties of furnisher were never triggered and granting 12(b)(6)

motion to dismiss FCRA claim).

There is no allegation in the Complaint that Tomlin disputed his credit report with any

credit reporting agencies or that any agency, in turn, notified the Defendants of the dispute, thereby

giving rise to their responsibilities under the FCRA.   *See Downs v. Clayton Homes, Inc.*, 88 F.

App'x 851, 853-54 (6th Cir. 2004) (finding that plaintiffs did not have a claim under § 1681s-2(b)

when they did not allege that they had filed a dispute with a credit reporting agency).   Absent

proper notification, the Defendants had no obligation under the FCRA to investigate or correct any

inaccurate information.

---

the person who provided the information in dispute all relevant information regarding the
dispute that is received by the agency from the consumer or the reseller after the period referred
to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

15 U.S.C. § 1681i (emphasis added).

Based on the above, Tomlin has failed to state a claim under § 1681s-2 for which relief can be granted, and his FCRA claims will be dismissed.[11]

## III.   FCRA Preemption of Certain State Law Claims.

The Defendants assert that Tomlin's state law claims of defamation, certain breach of contract claims, certain fraud claims, and as to the BONY Defendants, the intentional infliction of emotion distress ("IIED") claim, are preempted by the FCRA.

Congress' ability to preempt state laws stems from the Supremacy Clause which states "[t]he Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Thus, since the Supreme Court's decision in *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316 (1819), "it has been settled that state law that conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)). The phrase "state law" includes common law as well as statutes and regulations. *Id.* at 522.

However, there is an assumption that federal law is not preemptive. *Richardson v. Schafer (In re Schafer)*, 689 F.3d 601, 614 (6th Cir. 2012); *see also Cipollone*, 505 U.S. at 516 ("Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'" (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947))).

---

[11] The Defendants also assert Tomlin's FCRA claims are barred by the Act's statute of limitations. However, because the Court has dismissed Tomlin's FCRA claims pursuant to Rule 12(b)(6), it is unnecessary to address the statute of limitations defense as to the FCRA claims.

The Sixth Circuit has stated that deciding a preemption question is a two-step process: first ascertaining the construction of the two statutes and then determining whether they are in conflict. *Schafer*, 689 F.3d at 613.

> A state statute may conflict with federal law in one of three ways. Under "express preemption," the intent of Congress to preempt state law is explicit. *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 561 ([6th Cir.] 2002). Under "field preemption," Congress's regulation in a field "is so pervasive or the federal interest is so dominant that an intent can be inferred for federal law to occupy the field exclusively." *Id.* And, under "conflict preemption," the laws in question conflict such that it is impossible for a party to comply with both laws simultaneously, or where the enforcement of the state law would hinder or frustrate the full purposes and objectives of the federal law. *Id.*

*Schafer*, 689 F.3d at 613-14.

A.   <u>FCRA preemption provisions.</u>

As discussed below, the FRCA contains two provisions with potential preemption implications.

1.   <u>*FCRA Limited Liability Preemption provision.*</u>

When originally enacted in 1970, "the FCRA generally permitted state regulation of the consumer reporting industry. With but few exceptions, the original preemption provision, 15 U.S.C. § 1681t(a), preempted state laws only 'to the extent that those laws are inconsistent with any provision of the [FCRA].'" *Ross v. Fed. Deposit Ins. Corp.*, 625 F.3d 808, 813 (4th Cir. 2010) (quoting 15 U.S.C. § 1681t(a)). 15 U.S.C. § 1681t(a) currently provides:

> Except as provided in subsections (b) and (c) of this section, this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, . . . except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

An exception to state regulation, § 1681h(e), provides:[12]

---

[12] As originally enacted, the Limited Liability Provision, substantially the same as the current version, provided:

> Except as provided in sections 1681n and 1681*o* of this title, no consumer may
> bring any action or proceeding in the nature of defamation, invasion of privacy, or
> negligence with respect to the reporting of information against any consumer
> reporting agency, any user of information, or any person who furnishes information
> to a consumer reporting agency, based on information disclosed pursuant to section
> 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of
> a consumer report to or for a consumer against whom the user has taken adverse
> action, based in whole or in part on the report except as to false information
> furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e) [hereinafter "the Limited Liability Provision"].    Analyzing whether a

consumer's state law claim for defamation, invasion of privacy or negligence is precluded by the

Limited Liability Provision is a two-step process:    First the court determines whether the claim

falls within the scope of the provision which is limited to claims based on information disclosed by

(i) *credit reporting agencies* pursuant to §§ 1681g or 1681h, (ii) *users of credit reports* pursuant to

1681m, or (iii) *users of credit reports* regarding a consumer against whom the user has taken

adverse action based on the report.    *Ross*, 625 F.3d at 814.    If so, unless the malice or willful

intent to injure exception applies, the cause of action will be barred.    This is the second inquiry.

*Id*.

### 2.    *FCRA's Furnisher Preemption provision.*

In 1996, the FCRA was amended adding § 1681s-2 regarding furnishers' responsibilities.

*See* discussion *supra* pp. 13-15.    At that time, without repealing the general preemption provision

(only calling for preemption where state laws were inconsistent with the FCRA) or the Limited

Liability Provision, Congress added an additional preemption provision specifically focused on

"furnishers" as follows:

---

Except as provided in sections [1681n and 1681o of this title], no consumer may bring any action or
proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the
reporting of information against any consumer reporting agency, any user of information, or any
person who furnishes information to a consumer reporting agency, based on information disclosed
pursuant to section [1681g, 1681h, or 1681m of this title], except as to false information furnished
with malice or willful intent to injure such consumer.

Fair Credit Reporting Act, title VI, § 610, 84 Stat. 1114, 1131-32 (1970).

> No requirement or prohibition may be imposed under the law of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—
>
> > (i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or
> >
> > (ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996);

15 U.S.C. § 1681t(b)(1)(F) [hereinafter "the Furnisher Preemption Provision"].   To determine whether a state law cause of action is preempted under this provision, courts must first consider whether the action is based on allegations that a furnisher provided inaccurate or incomplete information to a credit reporting agency or that a furnisher failed to correct inaccurate information. If so, the action is barred.

   3.   *Approaches to analyzing preemption under the FCRA.*

   How do these two preemption provisions interrelate?   Courts disagree regarding the interplay between these provisions.   The application of the FCRA preemption provisions is "significantly complicated in several respects."   *Stafford*, 262 F. Supp. 2d at 784.   "First, the FCRA contains two overlapping and potentially contradictory preemption provisions, [the Furnisher Preemption Provision] and [the Limited Liability Provision], which limit the circumstances under which [Tomlin] may bring his state common law claims."   *Id.*   With respect to these two preemption provisions, the Sixth Circuit has stated:

> We have not yet decided whether [the Limited Liability Provision's] exception for claims alleging malice or willful intent has been overridden by [the Furnisher Preemption Provision], which was enacted later.   *See Macpherson v. JPMorgan Chase Bank, N.A.,* 665 F.3d 45, 47–48 (2d Cir. 2011), *cert. denied,* —— U.S. ——, 132 S. Ct. 2113, 182 L. Ed. 2d 870 (2012); *Purcell v. Bank of Am.,* 659 F.3d 622, 625 (7th Cir. 2011).   Even if [the Limited Liability Provision's] exception remains, [plaintiff's] claims still fail because his allegations of malice and willful intent are too vague and conclusory to state a claim.

*Brown*, 507 F. App'x at 548.

Second, as one commentator has noted, "[j]udicial bafflement over preemption language in the federal Fair Credit Reporting Act has produced a morass of muddled statutory construction. The circuit courts of appeal have largely dodged the issue, while federal district courts have scattered in at least four directions."   Randall D. Quarles, *Splintered District Courts Continue to Struggle with Federal Preemption of Credit-Reporting Claims*, 27 BANKING & FIN. SERVS. POL'Y REP. 8, 8 (2008).[13]

Recent decisions have concluded that the two provisions, read and applied strictly pursuant to their terms, are not in conflict.   The Court agrees.[14]

---

[13] "The tension between these two provisions therefore results from the fact that [the Limited Liability Provision] permits state tort claims, but requires a higher standard of proof for those in the nature of defamation, slander, or invasion of privacy, while [the Furnisher Preemption Provision] prohibits all state claims covered by § 1681s–2." *Stafford*, 262 F. Supp. 2d at 784-85.

[14] Three other approaches courts have used to reconcile perceived inconsistencies between the Furnisher Preemption Provision and the Limited Liability Provision are:

(a)   Total Preemption Approach.   The total preemption approach finds that the Furnisher Preemption Provision, enacted after the Limited Liability Provision, impliedly repealed the Limited Liability Provision and provides for total preemption of all state law claims against furnishers.   "Such an approach, however, runs afoul of several rules of statutory construction.   Most importantly, the Supreme Court has stated that 'repeals by implication are not favored.'" *Islam v. Option One Mortg. Corp.*, 432 F. Supp. 2d 181, 190 (D. Mass. 2006); see also *Stafford*, 262 F. Supp. 2d at 786 ("When it enacted [the Furnisher Preemption Provision], Congress neither made reference to nor expressly repealed [the Limited Liability Provision].").   This approach is also criticized because "[a]dopting this rule means that no state tort claims are ever permissible against any furnisher of credit information" and extends the Furnisher Preemption Provision beyond its express terms.   *Stafford*, 262 F. Supp. 2d at 785-86.

(b)   Temporal Approach.   The temporal approach looks to when the furnisher received notice that it provided inaccurate information to a credit reporting agency.   The Furnisher Preemption Provision applies to conduct after notice is received and the Limited Liability Provisions applies to conduct prior to notice.

> The justification for this "temporal" approach is that (a) [the Furnisher Preemption Provision] bars claims based on a furnisher's duties under § 1681s-2; (b) § 1681s-2 addresses a furnisher's responsibilities after receiving notice of an alleged inaccuracy; (c) [the Furnisher Preemption Provision], therefore, preempts only claims arising from post-notice conduct; and (d) [the Limited Liability Provision] permits any claims targeting pre-notice conduct if malice or willfulness are alleged.

Quarles, *supra*, at 10-11.   The temporal approach has been highly criticized as "strained at best," "circular and flawed."   *Id.* at 10.   *But see Stafford*, 262 F. Supp. 776 (wherein the United States District Court for the Western District of Kentucky adopted temporal approach); *Eddins v. Cenlar FSB*, 964 F. Supp. 2d 843, 850-51 (W.D. Ky. 2013) (discussing approaches to interpreting FCRA preemption analysis, acknowledging and disagreeing with criticism of *Stafford*, and reaffirming temporal approach adopted in *Stafford*).

(c)   Statutory Approach.   The statutory approach applies the Limited Liability Provision to preempt state common law tort claims and applies the Furnisher Preemption Provision to preempt only state statutory claims.   "Given that [the Limited Liability Provision] specifically mentions common law torts and that [the Furnisher Preemption Provision] includes references to two state statutes, courts in the statutory school find it appropriate to let [the Limited

"In construing a statute, the Court's 'starting point must be the language of the statutes.'"

*Johnson v. JP Morgan Chase Bank*, 536 F. Supp. 2d 1207, 1215 (E.D. Cal. 2008) (quoting

*Albernaz v. United States*, 450 U.S. 333, 336 (1981)).   Here, it is helpful to repeat the two

statutory provisions:

The Limited Liability Provision provides:

(e)   Limitation of liability

Except as provided in sections 1681n and 1681*o* of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, *based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action*, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e) (emphasis added).

The Furnisher Preemption Provision provides:

No requirement or prohibition may be imposed under the law of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—

(i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or

(ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996);

---

Liability Provision] govern tort claims while limiting [the Furnisher Preemption Provision] to statutes."   Quarles, supra, at 11.   This approach is criticized because (i) the Furnisher Preemption Provision does not contain language limiting its application to statutory claims, *Id.* (statutory approach "entails a rather flagrant judicial revision of the [Furnisher Preemption Provision] to add the 'statutory' qualifier."), and (ii) the two state statutes referenced in the Furnisher Preemption Provision are expressly excluded from preemption, not provided as examples of preemption. "As the U.S. Supreme Court has consistently recognized, 'requirements or prohibitions' under state law include both positive legislative enactments, as well as state common law duties."   Mark H. Tyson, *State Law Furnisher Liability Claims and the FCRA—The State of Confusion*, 63 CONSUMER FIN. L.Q. REP. 19, 21 (2009) (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) (holding that "[a]bsent other indication, reference to a State's 'requirements' includes its common-law duties" in preemption analyses)).

15 U.S.C. § 1681t(b)(1)(F).   In finding the two provisions "compatible," the Seventh Circuit

reasoned:

> [W]e do not perceive any inconsistency between the two statutes.   [The Limited
> Liability Provision] preempts some state claims that could arise out of reports to
> credit agencies; [the Furnisher Preemption Provision] preempts more of these
> claims.   [The Limited Liability Provision] does not create a *right* to recover for
> wilfully false reports; it just says that a particular paragraph does not preempt
> claims of that stripe.   [The Limited Liability Provision] was enacted in 1970.
> Twenty-six years later, in 1996, Congress added [the Furnisher Preemption
> Provision] to the United States Code.   The same legislation also added § 1681s–2.
> The extra federal remedy in § 1681s–2 was accompanied by extra preemption in
> [the Furnisher Preemption Provision], in order to implement the new plan under
> which reporting to credit agencies would be supervised by state and federal
> administrative agencies rather than judges.   Reading the earlier statute, [the
> Limited Liability Provision], to defeat the later-enacted system in § 1681s–2 and
> [the Furnisher Preemption Provision], would contradict fundamental norms of
> statutory interpretation.
>
> Our point is not that [the Furnisher Preemption Provision] repeals [the Limited
> Liability Provision] by implication.   It is that the statutes are compatible: the
> first-enacted statute preempts some state regulation of reports to credit agencies,
> and the second-enacted statute preempts more.   There is no more conflict between
> these laws than there would be between a 1970 statute setting a speed limit of 60 for
> all roads in national parks and a 1996 statute setting a speed limit of 55.   It is easy
> to comply with both: don't drive more than 55 miles per hour.   Just as the later
> statute lowers the speed limit without repealing the first (which means that, if the
> second statute should be repealed, the speed limit would rise to 60 rather than
> vanishing), so [the Furnisher Preemption Provision] reduces the scope of state
> regulation without repealing any other law.   This understanding does not vitiate
> the final words of [the Limited Liability Provision], because there are exceptions to
> [the Furnisher Preemption Provision].   When it drops out, [the Limited Liability
> Provision] remains.   But, even if our understanding creates some surplusage,
> courts must do what is essential if the more recent enactment is to operate as
> designed.

*Purcell*, 659 F.3d at 625.

In *Islam v. Option One Mortgage Corp*., 432 F. Supp. 2d 181, 190 (D. Mass. 2006), the

court, after acknowledging that a "no conflict" position is contrary to numerous federal court

decisions, stated:

> Despite the contrary assumption in most of the cited cases, [the Limited
> Liability Provision] and [the Furnisher Preemption Provision] usually are not in

conflict.   The Court instead is persuaded by Chief Judge John Heyburn that [the Limited Liability Provision] is not a preemption provision at all.   *See Webb v. Bob Smith Chevrolet, Inc.,* No. Civ. A. 3:04 CV 66 H, 2005 WL 2065237, at *4–5 (W.D. Ky. Aug. 24, 2005); *McAnly v. Middleton & Reutlinger, P.S.C.,* 77 F. Supp. 2d 810, 814 (W.D. Ky. 1999).[15]   Rather, [the Limited Liability Provision] is "a *quid pro quo* grant of protection for statutorily required disclosures."   *McAnly,* 77 F. Supp. 2d at 814.   "[The Limited Liability Provision] suggests not that Congress has limited actions brought in all areas regulated by the FCRA but that defendants will have qualified immunity from actions based on information disclosed pursuant to certain provisions [Sections 1681g, 1681h, and 1681m] of the FCRA."   *Webb,* 2005 WL 2065237, at *5.   Though not controlling, the heading for the section— "Limitation of liability"—also indicates that this interpretation is correct.

To understand this position, it is helpful to consider the state of the law prior to the enactment of [the Furnisher Preemption Provision], when only [the Limited Liability Provision] existed.   Consumers prior to 1996 could bring innumerable state-law claims against credit reporting agencies, users of credit reports, and furnishers of information.   Such claims were bounded only by what state law actually provided and the "[l]imitation of liability" provided by [the Limited Liability Provision]:   If the consumer brought a state-law claim "in the nature of defamation, invasion of privacy, or negligence", when the specified entities disclosed information pursuant to three specific Sections [1681g, 1681h, or 1681m], that state-law claim was viable only if the information was furnished maliciously or with a willful intent to injure.   All other state-law claims were unrestricted.

[The Limited Liability Provision] was and is not implicated unless the cause of action is "based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report. . . ."   The existence of [the Furnisher Preemption Provision] does not change this.   Sections 1681g and 1681h deal with disclosure of information by credit reporting agencies.   Section 1681m and the remaining portion of the quoted language deal with disclosure of information by users of information who then take adverse action against consumers based on that information.   [Defendant] is not a credit reporting agency and here is not sued in its capacity as a user of credit reports.   Moreover, it is not alleged to have taken any adverse action against the [plaintiffs] *based on* information in the [plaintiffs'] credit report; [defendant], rather, is the alleged furnisher of the incorrect information.   [The Limited Liability Provision] simply is not applicable to this case.   Only [the Furnisher Preemption Provision] applies here.

---

[15] *Webb* and *McAnly* involved a determination only as to the preemptive effect of the Limited Liability Provision on the matters before the court and did not involve the question of any conflict between the Limited Liability Provision and the Furnisher Preemption Provision.

*Islam*, 432 F. Supp. 2d at 193-94 (some citations omitted); *accord Leet v. Cellco P'ship*, 480 F.

Supp. 2d 422 (D. Mass. 2007); *Johnson*, 536 F. Supp. 2d 1207.

Accordingly, the Court analyzes whether Tomlin's state law claims are precluded by either

FCRA preemption provision.

> B.  Tomlin's state law claims are neither authorized nor preempted by FCRA's Limited
>     Liability Provision.

As reviewed above, to determine the applicability of the Limited Liability Provision, the

Court must determine whether the asserted state law claims are within the provision's scope which

is limited to claims based on information disclosed by:

> (i) *credit reporting agencies* pursuant to §§ 1681g or 1681h,
>
> (ii) *users of credit reports* pursuant to 1681m, or
>
> (iii) *users of credit reports* regarding a consumer against whom the user has
> taken adverse action based on the report.

*Ross*, 625 F.3d at 814.   If so, unless the malice or willful intent to injure element is present, the

cause of action will be barred.

Tomlin doesn't allege facts that bring any of his state law claims within the scope of the

Limited Liability Provision.   Specifically, he does not allege that any of the Defendants are a

consumer reporting agency[16] or a "user" of a consumer report with regard to Tomlin.   Thus, no

information could have been disclosed within the meaning of § 1681g or 1681h which are

applicable only to disclosures made by consumer reporting agencies.   Moreover, no information

could have been disclosed within the meaning of § 1681m which imposes requirements only on

---

[16]     The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a
cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or
evaluating consumer credit information or other information on consumers for the purpose of
furnishing consumer reports to third parties, and which uses any means or facility of interstate
commerce for the purpose of preparing or furnishing consumer reports.

15 USCA § 1681a(f).

users of information set forth in consumer reports.   *See Ross*, 625 F.3d at 814 (explaining that the

defendant bank was not a "user of consumer reports vis-à-vis" the plaintiff where plaintiff alleged

the banks provided false information to consumer reporting agencies).   Finally, Tomlin does not

allege that any of the Defendants took adverse action against Tomlin based on information in his

consumer report.   *Misel v. Green Tree Servicing, LLC*, 782 F. Supp. 2d 171, 177 (E.D.N.C. 2011)

(citing *Ross*, 625 F.3d at 814).

Because the Complaint's allegations are outside the Limited Liability Provision's scope,

the Limited Liability Provision neither authorizes nor precludes any of Tomlin's state law claims,

regardless of whether the Defendants acted maliciously or willfully.

C.   FCRA's Furnisher Preemption Provision preempts some of Tomlin's state law claims.

Defendants assert that the FCRA preempts Tomlin's state law claims of defamation,

certain breach of contract claims and certain fraud claims.   The BONY Defendants also assert

Tomlin's intentional infliction of emotional distress claim is preempted.

1.   *Furnisher Preemption Provision analysis.*

In deciding whether Tomlin's state law causes of action are preempted,

[W]e must fairly but—in light of the strong presumption against pre-emption—
narrowly construe the precise language of [the federal statute] and we must look to
each of petitioner's common-law claims to determine whether it is in fact
pre-empted. . . .

We consider each category of damages actions in turn.   In doing so, we express
no opinion on whether these actions are viable claims as a matter of state law; we
assume, *arguendo*, that they are.

*Cipollone*, 505 U.S. at 523-24.   Tomlin's state law causes of action are preempted to the extent

they are predicated on the "responsibilities of persons who furnish information to consumer

reporting agencies" with respect to any subject matter regulated under § 1681s-2.   15 U.S.C.

§ 1681t(b)(1)(F).   Specifically, the Court considers whether Tomlin's state law claims are based

on allegations that the Defendants furnished inaccurate reports to credit agencies or failed to

correct such inaccuracies.   If so, the claims are preempted by FCRA.

   2.   *FCRA preempts some of Tomlin's claims.*

   Defamation.   Tomlin asserts state law defamation claims against BONY and Saxon based

on actions that allegedly occurred at various times between November 2007 and October 2010 as

follows:

> a.   Between November 2007 and February 2009, Saxon and BONY allegedly
> defamed Tomlin by making unsubstantiated, incorrect negative credit reports
> [Compl. ¶¶ 75-76, 78-79].

These claims fall squarely within the Furnisher Preemption Provision and are preempted.

*Morgan*, 930 F. Supp. 2d at 839.

> b.   In May 2008, BONY and Saxon allegedly defamed Tomlin by filing an
> unsubstantiated foreclosure action [Compl. ¶ 77]—the BONY 2008
> Foreclosure.

This action is not related to the Defendants' responsibilities regulated under the Furnisher

Preemption Provision and is not preempted.

> c.   Between October 2009 and October 2010, BONY and Saxon allegedly
> defamed Tomlin by failing to advise credit agencies that Tomlin's payments
> were being made and were current [Compl. ¶ 80].

This allegation relates to providing information to the consumer reporting agencies, and standing

alone, is preempted by the Furnisher Preemption Provision.   However, notwithstanding inclusion

in Tomlin's "defamation claim," the allegations go on to state that BONY and Saxon were

required to take these actions per the 2009 Settlement Agreement.   [Compl. ¶ 103, 106.]   If this is

accurate, federal law does not preempt state law where a party has contractually obligated itself to

take such action.   *Leet*, 480 F. Supp. 2d at 432 ("Plaintiff's breach of contract claim is not

preempted, as [defendant's] alleged contractual obligations to remove the negative information

from plaintiff's credit report was not imposed by state law, but rather was imposed by [defendant] when it entered into the . . . agreement.").

As noted earlier, the 2009 Settlement Agreement is attached to the Complaint.   That agreement does not place any obligation or requirement on Defendants to report Tomlin's mortgage payments to the credit reporting agencies – or to correct any credit reporting errors. The agreement is unambiguous and makes no mention of credit reports, credit reporting, or credit agencies.   Further, the agreement provides in conspicuous type immediately above Tomlin's signature that the parties acknowledge that "EVERY PART OF EVERY AGREEMENT REACHED BY THEM IS STATED HEREINABOVE."   Thus, Tomlin's breach of contract claims based on these allegations fail because the 2009 Settlement Agreement did not require the Defendants to report to the credit reporting agencies that Tomlin's payments were being made or that they were current.   [Compl. ¶¶ 103, 106.]

Breach of Contract.   Tomlin alleges additional breach of contract claims as follows:

> d.   Saxon breached the Loan Modification Agreement by raising the monthly mortgage payments, imposing a $7,000 charge for unknown reasons and contending that the Loan Modification Agreement was not binding on Saxon [Compl. ¶¶ 99-102].
>
> e.   BONY, Saxon and/or Ocwen violated the 2009 Settlement Agreement by increasing his payments by including escrow charges for taxes and/or insurance or other unexplained charges [Compl. ¶¶ 104-05, 107-09].

This alleged conduct is not regulated under the Furnisher Preemption Provision and these claims are not preempted.

Fraud.   Tomlin asserts eleven counts of fraud.   The following fraud claims are each predicated on allegations that the Defendants' furnished inaccurate credit reports to a credit reporting agency and/or failed to correct inaccurate information.   As a result, they are preempted:

> f.   Count One against BONY and Saxon for erroneously reporting missed payments between November 2007 and May 2008.   [Compl. ¶ 113.]

g. Count Five against BONY and Saxon for erroneously reporting missed payments between January and April 2008.   [Compl. ¶ 117.]

h. Count Six against BONY and Saxon for erroneous reports between May 2008 and January 2009 regarding the foreclosure of the Property. [Compl. ¶ 118.]

i. Count Seven against BONY and Saxon for erroneously reporting past due payments in February 2009.   [Compl. ¶ 119.]

j. Count Eight against BONY and Saxon for failing to report Tomlin's payments were current per the 2009 Settlement Agreement during the time period of October 2009 through October 2010.   [Compl. ¶ 120.]

k. Count Nine against BONY, Saxon and Duran for an allegedly false affidavit stating that credit reports had been corrected.[17]   [Compl. ¶ 121, 132.]

The remaining fraud claims [Compl. ¶¶ 114-16, 122-23] are based on conduct not regulated by the

Furnisher Preemption Provision and are not preempted.

Intentional Infliction of Emotional Distress ("IIED").   Tomlin asserts IIED claims against

BONY:

l. For furnishing inaccurate credit reports which Tomlin asserts caused him "significant distrust, frustration and distress, and has rendered Plaintiff hopeless as to his ability to regain his good name and the credit rating that he deserves and has worked hard to earn. . . ."   [Compl. ¶ 124.]

This claim, based on inaccurate credit reports, is preempted by the FCRA.

m. For BONY's allegedly fraudulent attempts to foreclose on the Property. [Compl. ¶ 125.]

Such conduct is not regulated by the § 1681s-2; thus is not preempted.

---

[17] Tomlin labels the claim in paragraph 132 of the Complaint as one for perjury based on the same facts as the fraud claim in paragraph 121.   There is no private right of action for perjury and to the extent Tomlin is asserting a fraud claim, it is preempted.   *See Regal Marble, Inc. v. Drexel Invs., Inc.*, 568 So. 2d 1281, 1282-83 (Fla. Dist. Ct. App. 1990) ("There is no cause of action recognized in this state for false statements made in prior judicial proceedings."); *Hill v. Lee Cty. Sheriff's Office*, No. 2:11-cv-242-FtM-29SPC, 2012 WL 4356818, at *4 (M.D. Fla. Sept. 24, 2012) (finding no private cause of action exists under federal criminal statute).   The allegations in paragraphs 121 and 132 are the only claims against Duran.

## IV.    <u>Tomlin's Remaining State Law Claims</u>.

A.    <u>Summary of remaining claims</u>.

Based on the foregoing, Tomlin's remaining claims are for defamation, breach of contract, fraud, IIED and tortious interference with contractual relations.    These claims are based on allegations that one or more of the Defendants (i) attempted to impose unauthorized charges on his Note, including an escrow for taxes and/or insurance; (ii) intentionally misapplied his payments so that his account would be past due and his debt accelerated; (iii) filed foreclosure actions against him falsely asserting he had missed payments; and (iv) falsely advised his insurer that the Property was "foreclosed" and vacant.    Tomlin claims he was injured because his credit was negatively affected, he was unable to obtain financing or secure employment relative to his career in accounting, and his homeowner's insurance policy was cancelled.    Tomlin further alleges he lost wages and suffered emotional duress.

B.    <u>Choice of law analysis/state statutes of limitation</u>.

Defendants assert Tomlin's state law claims are barred by applicable state statutes of limitation because the mortgage executed in conjunction with the Note provides:    "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located."    [Compl. Ex. J at 19 ¶ 16.]    Thus, the Defendants assert that the parties' rights are governed by Florida law, where the Property is located, rather than Kentucky.    Tomlin does not expressly object to the application of Florida law but "relinquishes the decision" to this Court. [Obj. to Defs.' Mot. to Dismiss 3, ECF No. 33.]

"Under Kentucky law, the burden of proof when asserting an affirmative defense, like the statute of limitations, is on the party who raises it."    *Hines v. Hiland*, No. 5:09-CV-00075-R, 2011 WL 1131521, at *2 (W.D. Ky. Mar. 25, 2011).    As such, the burden is on the Defendants to show that the limitations period has run.    Although Tomlin is not required to negate affirmative

defenses in his Complaint, the BONY Defendants' "Rule 12(b)(6) [motion] will be granted if . . .

the claim shows on its face that relief is barred by an affirmative defense." *Riverview Health Inst.*

*LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 513 (6th Cir. 2010).

Similarly the Saxon Defendants, as the parties moving for summary judgment, "bear[] the

initial burden of showing the absence of a genuine issue of material fact." *Johnson v. U.S. Postal*

*Serv.*, 64 F.3d 233, 236 (6th Cir. 1995). "Where a defendant seeks summary judgment on an

affirmative defense on which it will bear the ultimate burden of proof at trial, summary judgment

is proper 'only if the record shows that [the defendant] established the defense so clearly that no

rational [fact finder] could have found to the contrary.'" *Snyder v. Kohl's Dept. Stores, Inc.*, 580

F. App'x 458, 461 (6th Cir. 2014) (first alteration in original) (quoting *Beck-Wilson v. Principi*,

441 F.3d 353, 365 (2006)). "Only after, and not before, the initial burden of proof is discharged

does the burden shift to the plaintiff to show that summary judgment on an affirmative defense

should be denied." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (2013).

The Court agrees that to the extent the causes of action arise from the loan transaction

involving the mortgage, Florida's *substantive* law applies to Tomlin's remaining state law claims.

However, "contractual choice-of-law clauses incorporate only substantive law, not *procedural*

*provisions such as statutes of limitations*." *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998)

(emphasis added), *quoted in Conway v. Portfolio Recovery Assocs., LLC*, 13 F. Supp. 3d 711, 715

(E.D. Ky. 2014).

> [U]nless the choice of law provision in the parties' agreement expressly provides
> otherwise, the procedural law of the forum state will determine issues concerning
> which state's statute of limitations applies. Accordingly, the Court will apply
> Kentucky's borrowing statute in this matter. The purpose of state borrowing
> statutes is generally to bar suits against the state's residents "if the right to sue [the
> resident] had already expired in another state where the combination of
> circumstances giving rise to the right to sue had taken place. . . ."

*Conway*, 13 F. Supp. 3d at 715 (citation omitted).

There is a significant difference between Florida's and Kentucky's statutes of limitation as to some of the causes of action; thus the Court turns to application of Kentucky's borrowing statute which provides:

> When a cause of action has arisen in another state or country, and by the laws of this state or country where the cause of action accrued the time for the commencement of an action thereon is limited to a shorter period of time than the period of limitation prescribed by the laws of this state for a like cause of action, then said action shall be barred in this state at the expiration of said shorter period.

KY. REV. STAT. § 413.320.

> A three-step analysis is therefore necessary to determine the applicability of this statute: (1) did the cause of action accrue in another state? (2) If so, is that state's statute of limitations for the particular cause of action shorter than the corresponding Kentucky statute of limitations? (3) If so, application of the accrual state is applied; if not, Kentucky's statute of limitations is applied.

*Swanson v. Wilson*, 423 F. App'x 587, 593 (6th Cir. 2011).

"Where the cause of action accrued, . . . is the 'key factor' in any analysis of how to apply the borrowing statute."   *Conway*, 13 F. Supp. 3d at 716 (quoting *White v. Hartford Life Ins. Co.*, No. 3:06-CV-288-H, 2008 WL 4104487, at *6 (W.D. Ky. Sept. 3, 2008)); *see also Combs v. Int'l Ins. Co.*, 354 F.3d 568, 597 (6th Cir. 2004) ("conclud[ing] that the Kentucky Supreme Court would apply [its] borrowing statute by focusing only on where the cause of action accrued, not on which state has the greatest interest in the dispute").   "To determine where a cause of action accrued, the Court must apply Kentucky Law."   *Conway*, 13 F. Supp. 3d at 716 (citing *Cope v. Anderson*, 331 U.S. 461, 466-67 (1947) (applying state law to determine where the cause of action accrued for purposes of that state's borrowing statute).   The Kentucky Supreme Court recently addressed application of Kentucky's borrowing statute, stating:

> Although we have often discussed *when* an action accrues, we have less frequently addressed the question of *where,* for purposes of KRS 413.320, the cause of action accrued.   It is clear however that *where* an action "accrues" is inextricably intertwined with *when* it accrues.   "The place where a cause of action arises is the place where the operative facts that give rise to the action occur. . . .

[I]t is the happening of the last of such facts which brings the cause of action into existence[.]"    *Helmers v. Anderson,* 156 F.2d 47, 50 (6th Cir. 1946).    *Helmers* further explains:

> The time when a cause of action arises and the place where it arises are necessarily connected, since the same act is the critical event in each instance. *The final act which transforms the liability into a cause of action necessarily has both aspects of time and place. It occurs at a certain time and in a certain geographical spot.*

> *Id.* at 51 (emphasis added).    Because "when" a cause of action accrues is closely connected to "where" it accrues, knowing when the "final act" occurred that ripened the matter into a cause of action aids in ascertaining *where* the cause of action accrued.

*Abel v. Austin*, 411 S.W.3d 728, 736 (Ky. 2013) (citation omitted), *quoted in Conway*, 13 F. Supp. 3d. at 717-18.

None of the parties addressed application of Kentucky's borrowing statute.    The parties shall have twenty-one days to file briefs on this issue and decision on the statutes of limitation defense is reserved.

**V.    Remaining Claims against BONY Defendants and Analysis under Motion to Dismiss Standard.**

Tomlin's remaining causes of action arise from the loan transaction involving the mortgage—they arise from disputes between the parties as to payments due on the Note, secured by the mortgage, as modified by the Loan Modification Agreement or the 2009 Settlement Agreement.    Thus, pursuant to the parties' choice of law provision reviewed above, the Court will apply Florida substantive law.

The BONY Defendants assert, as to certain of the remaining state law claims, that the Complaint fails to allege facts to satisfy the elements necessary to establish such causes of action and such claims should be dismissed for failure to state a claim under Civil Rule 12(b)(6).

A.  Defamation claim against BONY Defendants [Compl. ¶ 77].

Tomlin alleges that in May 2008, BONY defamed Tomlin by filing the BONY 2008

Foreclosure.   Their state statute of limitations defense is reserved and the BONY Defendants do

not posit an alternate Rule 12(b)(6) argument with respect to this remaining defamation claim.

Thus, their Motion to Dismiss is reserved as to the claim described in paragraph 77 of the

Complaint.

B.  Breach of Contract claims against the BONY Defendants [Compl. ¶¶ 104-05, 107-09].

The elements for breach of contract claim under Florida law are: (1) the existence of a

contract between the parties; (2) a breach of that contract; and (3) damages.   *Beck v. Lazard*

*Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999).

Tomlin alleges that between October 2009 and February 2010 [Compl. ¶¶ 104-05], and

again during 2011 [Compl. ¶¶ 107-09], the BONY Defendants breached the 2009 Settlement

Agreement by attempting to increase Tomlin's payments by including unauthorized escrow

charges for taxes and property insurance and assessing other unexplained charges.

The BONY Defendants correctly assert that the terms of the 2009 Settlement Agreement

permitted them to impose an escrow if Tomlin failed to maintain property insurance or pay the

taxes associated with the Property.   [*See* 2009 Settlement Agreement ¶ 1.(4) ("Defendant

[BONY] shall henceforth not require escrow payments for property tax and insurance so long as

those are paid directly by Plaintiff.").]   The BONY Defendants contend the Complaint fails to

allege that Tomlin made the required payments and thus, the breach of contract claims must be

dismissed for failure to state a claim for which relief can be granted.

The Complaint alleges that the escrow charges were unauthorized per the 2009 Settlement

Agreement.   As the only basis on which BONY was authorized to assess the escrow, was

Tomlin's nonpayment of taxes and insurance, it is reasonable to infer that the escrow charges were

"unauthorized" because Tomlin had paid the taxes and insurance directly.    Accepting the
assertion as true as required by the standard set forth in *Iqbal*, the allegation is sufficient to state a
claim for relief that is plausible on its face.[18]   The breach of contract claims will not be dismissed
on this basis; however, the BONY Defendants' statute of limitation defense is reserved pending
further orders of the Court.

    C.   Fraud claims against the BONY Defendants.

The essential elements of common law fraud or fraudulent misrepresentation are:   (i) a
false statement of material fact; (ii) defendant's knowledge that the statement was false; (iii)
defendant's intent that the statement induce plaintiff to act; (iv) plaintiff's reliance upon the truth
of the statement; and (v) plaintiff's damages resulting from reliance on the statement.   *Mukamal
v. Gen. Elec. Capital Corp. (In re Palm Beach Fin. Partners, L.P.)*, 517 B.R. 310, 336 (Bankr. S.D.
Fla. 2013).

Pursuant to Civil Rule 9(b), incorporated into adversary proceedings by Bankruptcy Rule
7009, fraud must be pled with particularity.   "At a minimum, the Plaintiff must allege 'the time,
place and content of the alleged misrepresentation on which he or she relied; the fraudulent
scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"   *Cline v.
Kondaur Capital Corp. (In re Cline)*, Ch. 13 No. 12-30490, Adv. No. 13-3002, 2013 WL 4525727,
at *3 (Bankr. E.D. Ky. Aug. 27, 2013) (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th
Cir. 2011)).

Tomlin has two remaining fraud claims against the BONY Defendants:   The first based on
actions taken in 2008 and the second based on actions taken in 2011.

---

[18]  In his objection, Tomlin asserts that the property taxes and insurance were well maintained by him and that the
Defendants paid the property taxes even though they were not due.   He further alleges that the homeowner's
insurance was cancelled based on erroneous information provided by the Defendants to the insurer.   If the Court finds
a claim is incomplete, Tomlin requests the opportunity to amend his Complaint.

1.  *Fraud allegations – events occurring in 2008 [Compl. ¶¶ 114-16].*

Tomlin alleges that in April 2008, BONY and Saxon intentionally misapplied Tomlin's

payments on the Note as part of a scheme so BONY would have a reason to accelerate the Note

and begin foreclosure proceedings.   In May 2008, BONY and Saxon filed the BONY 2008

Foreclosure in which Tomlin asserts they falsely claimed he had not made a mortgage payment

since February 2008 and that other payments were past due under the Note.

Relying solely on their arguments that the claims are preempted by the FCRA (denied,

*supra* p. 29) or barred by the state statute of limitations (reserved), the BONY Defendants do not

posit any other Rule 12(b)(6) arguments with respect to these fraud claims.   Therefore, their

Motion to Dismiss based on a statute of limitation defense is reserved as to the claims described in

paragraphs 114-16 of the Complaint.

2.  *Fraud allegations – events occurring in 2011 [Compl. ¶¶ 122-23].*

Tomlin also bases a claim for fraud on the same allegations on which he asserts his breach

of contract claim; i.e., during 2011, the BONY Defendants attempted to increase Tomlin's

payments by sending him mortgage statements including unauthorized escrow charges for taxes

and property insurance and assessing other unexplained charges.   Tomlin theorizes that the

BONY Defendants were engaged in a scheme to create a basis for a foreclosure action.   Tomlin

alleges that BONY knew the mortgage statements were inaccurate, the "falsification was made in

order to accelerate the note again, begin a foreclosure process and profit from the gain of the

property," and "Plaintiff has been relying on the settlement agreement."   [Compl. ¶¶ 122.2) to

.4).]   Between October and December 2011, Tomlin refused to make payments because, in his

opinion, the BONY Defendants were not complying with the 2009 Settlement Agreement.

[Compl. ¶ 64.]   However, Tomlin alleges that to stop the foreclosure process, he was forced to

make payments in the amounts demanded by the BONY Defendants, after which the payments

were increased again.   [Compl. ¶¶ 65-67.]

The BONY Defendants assert that Tomlin's claim for fraud in paragraphs 122-23 fails to meet the heightened pleading standard for fraud.   However, they do not explain how the Complaint fails to meet the standard other than asserting the mortgage statements were not false because the BONY Defendants were expressly allowed to include escrow charges if taxes and insurance were not directly paid by Tomlin.   As discussed above, whether or not Tomlin paid those amounts is a matter that requires discovery and briefing.   Accepting Tomlin's allegations as true and while his allegations of fraud are thin, they are sufficient to survive a motion to dismiss. The BONY Defendants have not provided any other basis supporting their contention that this claim should be dismissed.   Therefore, the BONY Defendants' Motion to Dismiss is denied with respect to Tomlin's fraud claim set forth in paragraphs 122-23 of the Complaint.

D. IIED claim against BONY Defendants [Compl. ¶ 125].

"To prove intentional infliction of emotional distress under Florida law, the plaintiff must prove: (1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990).   "Conduct is intentional '[w]here the actor knows that [severe] distress is certain, or substantially certain to result from his conduct.'" *Id*. (alterations in original) (quoting *Ford Motor Credit Co. v. Sheehan*, 373 So. 2d 956, 958 (Fla. Dist. Ct. App. 1979).   "Outrageous conduct is conduct which 'is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"   *Id*. (quoting *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985)).

"Whether the conduct complained of is sufficiently outrageous and extreme to withstand a motion to dismiss is purely a question of law for the Court to decide."   *Orta v. City of Orlando*,

No. 6:14-cv-1835-Orl-41GJK, 2015 WL 2365834, at *5 (M.D. Fla. May 18, 2015) (quoting

*Decius v. Nat'l Serv. Indus., Inc.*, No. 01-8320-CIV, 2001 WL 1621924, at *2 (S.D. Fla. Nov. 1,

2001)).

Tomlin asserts an IIED claim against BONY based on its allegedly fraudulent attempts to

foreclose on the Property.   He states that as a result, he has "suffered severe emotional distress

and depression which has negatively impacted his quality of life."   [Compl. ¶ 125.]   The BONY

Defendants cite several cases supporting their argument that their alleged actions, even if taken as

true, do not rise to the outrageous and extreme level required by Florida law to support Tomlin's

claim for relief.   However, those cases are distinguishable based on the facts alleged here.

Accepting Tomlin's allegations as true, the BONY Defendants breached two agreements

within the first month after entering into such agreements, then continued to breach those

agreements, assessed unauthorized charges against him causing his account to appear to be

continually in default, and filed foreclosure actions attempting to collect a debt that was not past

due.   In *Chungag v. Wells Fargo Bank, N.A.*, 489 F. App'x 820 (6th Cir. 2012), the Sixth Circuit

affirmed dismissal of plaintiff's intentional infliction of emotional distress claim against the

mortgagee under Michigan law, which is substantially the same as Florida law.   In so doing

however, the Sixth Circuit stated:

> Although the facts of this case are unfortunate, the facts alleged in the
> complaint do not rise to the level of extreme, outrageous conduct on the part of
> Wells Fargo that, if proven true, would be actionable in tort in Michigan.   The
> facts establish that Wells Fargo rightly believed that the Chungags were in default
> on their mortgage and initiated foreclosure proceedings thereafter.   To be sure, it
> appears that Wells Fargo could have handled the matter more delicately, but the
> fact remains that the bank was within its rights to pursue foreclosure on the house.
> *If the Chungags had not defaulted, it is possible that Wells Fargo's attempts to
> collect payments not actually owed to them through "[c]ontinuous unnecessary
> harassment" might be actionable.*   But that is not what happened here: Wells
> Fargo had a right to foreclose on the property and, in any event, the factual
> allegations do not evince a pattern of continuous unnecessary harassment that
> could be deemed sufficiently outrageous.   Accordingly, the Chungags have

> failed to state a claim for IIED, and the district court properly dismissed this
> claim.

*Chungag*, 489 F. App'x at 825 (emphasis added) (citing *Margita v. Diamond Mortg. Corp.*, 406

N.W.2d 268, 272 (Mich. Ct. App. 1987) (summary disposition was inappropriate as to IIED claim

where defendant mortgagee repeatedly harassed plaintiffs through phone calls and letters

assessing late charges and threatening foreclosure in attempting to *collect a debt that was not*

*overdue*).   *But see Jenkins v. JP Morgan Chase Bank, N.A. (In re Jenkins)*, 488 B.R. 601, 617

(Bankr. E.D. Tenn. 2013) (Under Tennessee law, "'[a] breach of contract, even if clear, is not by

itself actionable under the tort of outrageous conduct, nor will a negligent or inadvertent act give

rise to such a claim.'" (quoting *Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615, 623 (Tenn. Ct.

App. 1986))).[19]   Tomlin also asserts that although he has asked for evidence that BONY is the true

owner of the Note, such evidence has not been provided.   In the BONY 2008 Foreclosure

complaint, BONY states the original Note and Mortgage have been lost and requests that the state

court re-establish those documents pursuant to Florida Statutes § 673.3091.   [Compl. Ex. E, ECF

No. 1 at 39.]   There is no indication in the record that the state court granted that request.

Accepting Tomlin's allegations as true as required by the standard set forth in *Iqbal*, they

are sufficient to state a claim for relief that is plausible on its face and that will require discovery

and briefing.   For these reasons, the BONY Defendants' Motion to Dismiss the IIED claim

[Compl. ¶ 125] is denied.

### E.  Claim for tortious interference with contractual relationship against the BONY Defendants [Compl. ¶¶ 128-30].

Tomlin asserts a claim for tortious interference with contractual relations based on Saxon

and/or other Defendants allegedly informing his insurer on three separate occasions (January 28,

2008, February 2009 and Spring 2011) that the Property was vacant and/or subject to foreclosure

---

[19] The law in Tennessee with respect to IIED claims is also substantially the same as that in Florida.

or foreclosed upon.   [Compl. ¶¶ 128-30.]   Such actions were allegedly unfounded and resulted in

Tomlin's property insurance being cancelled and his inability to renew the insurance.

The BONY Defendants' argument that these claims are barred by the applicable statute of

limitations is reserved.   They do not provide an alternate basis for dismissal.

## VI.   Remaining Claims against Saxon Defendants and Analysis under Summary Judgment Standard.

Duran is entitled to judgment as matter of law as to the only claims asserted against him,

*see supra* p. 28 & n.17, and no further discussion is necessary as to Duran.

The claims remaining against Saxon are discussed below.

A.  Summary judgment standard.

The claims against Saxon are analyzed under the summary judgment standard.   Pursuant

to Bankruptcy Rule 7056, Civil Rule 56 applies in adversary proceedings.

> [O]n several occasions, the Court of Appeals for the Sixth Circuit has described the standard to grant a motion for summary judgment as follows:

>> A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under this test, the moving party may discharge its burden by "pointing out to the [bankruptcy] court . . . that there is an absence of evidence to support the nonmoving party's case."

*Buckeye Ret. Co., LLC, Ltd., v. Swegan (In re Swegan)*, 383 B.R. 646, 652-53 (B.A.P. 6th Cir.

2008) (quoting *Gibson v. Gibson (In re Gibson),* 219 B.R. 195, 198 (B.A.P. 6th Cir. 1998)).   The

Supreme Court instructs that a court must look beyond the pleadings and assess the proof needed

to determine whether there is a genuine need for trial.   *See Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.   The

evidence of the non-movant is to be believed, and all *justifiable* inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (emphasis added).   After making an assessment of the proof, the determinative issue is "whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.   In this regard, the moving party carries the burden of showing there is an absence of evidence to support a claim.   *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-25 (1986).   After the moving party meets this burden, the nonmoving party must go beyond the pleadings to identify more than a mere scintilla of evidence showing that there is a genuine issue of material fact for trial.   *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989); FED. R. CIV. P. 56(c).   "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"   *Street,* 886 F.2d at 1479 (quoting *Anderson,* 477 U.S. at 257).

B.  Additional facts and arguments relevant to release and *res judicata*.

Saxon asserts that claims against it based on events prior to November 13, 2009, were released pursuant to the 2009 Settlement Agreement and a release executed in conjunction therewith by Tomlin and his wife on November 13, 2009 [ECF No. 53-3] ("Release" and together with the 2009 Settlement Agreement, the "Settlement Documents").   Tomlin agrees that some of the claims herein were included in the Tomlin Lawsuit which was dismissed with prejudice as part of the 2009 Settlement Agreement.   [*See* Mem. in Supp. of Pl.'s Opp'n 2, ECF No. 68.] However, he asserts that the 2009 Settlement Agreement "was entered into under 'false pretenses', thus FRAUD, frees the claims/counts from being bound by that litigation (res judicata and release) and allows them to be re-examined in a court of law."   [*Id.* at 9.]   The "false pretenses" or

representations alleged is a statement contained in the Duran Affidavit, dated April 14, 2010, in

which Duran states that "all errors on the Tomlins' account with Saxon have now been corrected"

[ECF No. 53-4] ("Duran Affidavit").

The 2009 Settlement Agreement provides:

1.   Defendant agrees to modify Plaintiff's loan as follows: (1) Rate reduction/
freeze of 7.00% through the life of the loan; (2) Plaintiff shall pay the amount of
$3681.68 in certified funds by November 15, 2009; (3) First payment of $878.20
shall be due by 12/1/09; (4) Defendant shall henceforth not require escrow
payments for property tax and insurance *as long as those are paid directly by
Plaintiff*; (5) Balloon payment of $18,681.69 due on July 1, 2034; (6) No
prepayment penalty; (7) Plaintiffs shall return the executed loan modification
documents prepared by Defendant to Defendant by 11/1/09 or sooner if possible;

2.   Plaintiffs shall dismiss this case with prejudice as to each Defendant named
therein with pleading prepared by counsel for Defendant providing that each party
shall bear his/her/its own attorney fees and costs; Plaintiffs shall further execute a
Release of all claims and Confidentiality Agreement prepared by counsel for
Defendant.   All parties hereto shall be dismissed with prejudice.

3.   Defendants shall dismiss the pending foreclosure on the real property in
question in this case upon the completion of items (1) and (2) above.   Said
dismissal shall specify that each party to the foreclosure shall bear his/her/its own
costs and attorney fees.

4.   It is the intention of the parties that there should be no further claims made
by any of them against any of the others of them for anything which could be a
claim as of this date unless separately set forth herein.
. . .

6.   PLAINTIFF AND DEFENDANT ACKNOWLEDGE THAT ALL OF
THEIR AGREEMENTS, AND EVERY PART OF EVERY AGREEMENT
REACHED BY THEM IS STATED HEREINABOVE.

[2009 Settlement Agreement 1-2.]   The Release, executed pursuant to paragraph 2 of the 2009

Settlement Agreement, releases Tomlin's claims against Saxon[20]

for any loss, damages, or expenses sustained or incurred as a result of the issues and
incident which is the subject matter of the [Tomlin Lawsuit]. . . .

The TOMLINS understand and agree that the terms hereof and of the [2009
Settlement Agreement] is in full and final settlement of this matter and is the

---

[20] BONY is also a party to the Release, but as noted above, BONY has reserved argument on the 2009 Settlement
Agreement and Release pending decision on the Motion to Dismiss.

compromise of a disputed claim or claims. . . .   This Release represents a fair, reasonable and equitable settlement, arrived at through good faith negotiations following consideration of all factual and legal issues, and is given for good and valuable consideration following a settlement and resolution of the disputes between the parties, memorialized in the [2009 Settlement Agreement], and is binding upon all parties, and their legal representatives and assigns.   The Tomlins additionally understand and agree that they must abide by the terms and conditions of the loan modification agreement referenced in Exhibit "4" to avoid collection proceedings and/or litigation which could be initiated by and on behalf of [Saxon].

[Release 1-2.]

The timeline with respect to Tomlin's allegations that the Settlement Documents are unenforceable due to fraudulent inducement is:

> October 6, 2009 – the 2009 Settlement Agreement was executed.
>
> November 13, 2009 – the Release was executed.
>
> April 14, 2010 – the Duran Affidavit is executed.
>
> April 26, 2010 – the State Enforcement Order was entered in the Tomlin Lawsuit [Compl. ¶ 55].
>
> May 21, 2010 – Tomlin filed the notice of voluntary dismissal of the Tomlin Lawsuit.

C.  <u>Law and analysis regarding release</u>.

"In Florida, settlement agreements are governed by the law of contracts."   *Nichols v. Hartford Ins. Co. of the Midwest*, 834 So. 2d 217, 219 (Fla. Dist. Ct. App. 2003).   "Thus, there must be an offer, acceptance, and consideration, as well as a meeting of the minds on all essential terms."   *PNC Bank, N.A. v. Rolsafe Int'l, LLC (In re Rolsafe Int'l, LLC)*, 477 B.R. 884, 902 (Bankr. M.D. Fla. 2012).

Although the public policy of Florida "highly favors settlement agreements among parties and will seek to enforce them whenever possible," Florida law does not bar certain fraudulent inducement claims that (1) have not themselves been unequivocally released as part of the settlement agreement, and (2) are based on material misrepresentations to induce settlement.

*Gogoleva v. Soffer*, --- So. 3d ---, 2016 WL 626131, at *5 (Fla. Dist. Ct. App. Feb. 17, 2016)

(quoting *Sun Microsystems of Cal., Inc. v. Eng'r & Mfg. Sys., C.A.,* 682 So. 2d 219, 220 (Fla. Dist.

Ct. App. 1996)).

> With respect to the claim alleging fraud in the inducement, . . . , as a general rule, summary judgment is not appropriate to resolve a fraud claim under Florida law.   "Nevertheless, there are circumstances which will permit summary judgment even where fraud is alleged."

> The essential elements to establish a claim for fraudulent inducement are: (1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment.

*Rose v. ADT Sec. Servs., Inc.*, 989 So. 2d 1244, 1247 (Fla. Dist. Ct. App. 2008) (quoting *Peninsula*

*Yacht Cay Dev. Inc. v. S. Floridabanc Sav. Ass'n,* 552 So. 2d 1139, 1140 (Fla. Dist. Ct. App.

1989)).

As the moving party, Saxon bears the burden of demonstrating that there are no genuine

issues of material fact.   *MERV Props., L.L.C. v. Forcht Bancorp, Inc. (In re MERV Props.,*

*L.L.C.)*, 539 B.R. 516, 526 (B.A.P. 6th Cir. 2015).   On their face, the Settlement Documents

appear to be a valid contract between the parties, supported by consideration:   Tomlin benefitted

from the loan modification reducing his interest rate and BONY and Saxon agreed to dismiss the

BONY 2008 Foreclosure and forego escrow payments if Tomlin met certain conditions.   The

2009 Settlement Agreement was signed by Tomlin, Saxon and BONY and the Release was signed

by Tomlin and his wife.   Saxon met its initial burden as the movant and the burden shifts to

Tomlin to show that the Settlement Documents are not valid.   *Id.* at 527.   "[Tomlin] must offer

'more than a mere scintilla of evidence it [his] favor, . . . and cannot simply reassert factually

unsupported allegations contained in [his] pleadings[.]'"   *Id.*

There are several flaws in Tomlin's argument that the 2009 Settlement Agreement and/or Release are unenforceable because of fraud.

First, the validity of the 2009 Settlement Agreement was determined when the state court entered the State Enforcement Order at Tomlin's request.   At that time, Tomlin considered the agreement enforceable.   [*See* Compl. ¶ 56 ("Now that a settlement agreement is in place and the judge has enforced it, Mr. Tomlin filed his notice of voluntary dismissal which ended the case.").] Tomlin offers no authority that permits this Court to reconsider the state court's ruling regarding the enforceability of the 2009 Settlement Agreement.

Second, as a factual matter Tomlin has not established the existence of a false statement on which he justifiably relied.   The April 2010 Duran Affidavit, which he alleges constitutes the false statement, did not exist at the time he entered into the 2009 Settlement Agreement (October 2009) and the Release (November 2009).

Moreover, even had the Duran Affidavit been provided prior to Tomlin entering into the 2009 Settlement Agreement and Release, Florida law establishes that under the circumstances of this case, Tomlin was not entitled to rely on those statements.   The Tomlin Lawsuit arose from a clearly antagonistic relationship between Tomlin and the Defendants.   The Florida courts have held that

> "When negotiating or attempting to compromise an existing controversy over fraud and dishonesty it is unreasonable to rely on representations made by the allegedly dishonest parties.   Thus, the appellants have failed to make a prima facie case of fraud because they had no legal right to rely on any representations under these circumstances."

*Pieter Bakker Mgmt., Inc. v. First Fed. Sav. & Loan Ass'n*, 541 So.2d 1334, 1335-36 (Fla. Dist. Ct. App. 1989) (affirming grant of summary judgment to bank that borrowers' counterclaims, including fraud, breach of contract, defamation, and negligence, were barred by settlement agreement and borrowers failed to make prima facie case that settlement was fraudulently

induced) (quoting *Pettinelli v. Danzig*, 722 F.2d 706 (11th Cir. 1984)), *accord Moriber v. Dreiling*, --- So. 3d ---, 2016 WL 145968, at *3, n.3 (Fla. Dist. Ct. App. Jan. 13, 2016) (compiling cases in which Florida state and federal courts consistently hold that, as a matter of law, a plaintiff may not rely on statements made by litigation adversaries to establish fraud claims).   Here, similar to the borrowers in *Pieter*, Tomlin was "not entitled to rely blindly on the opposing party's representations where, . . . the relationship between the parties has been plagued with distrust." *Id.* at 1335.   Tomlin has failed to show that there exists a dispute of material fact as to the validity of the Settlement Documents.

Based on the foregoing, the 2009 Settlement Agreement and Release are enforceable. Saxon is entitled to judgment as a matter of law with respect to the claims filed against it for (i) defamation contained in paragraph 77 of the Complaint; (ii) breach of contract contained in paragraphs 99-102 of the Complaint; (iii) breach of contract, to the extent the conduct on which the claim is based occurred after November 13, 2009, contained in paragraphs 104-05 of the Complaint; (iii) fraud contained in paragraphs 114-16 of the Complaint; and (iv) tortious interference with contractual relations contained in paragraphs 128 and 130 of the Complaint.

D.   Claims surviving dismissal as to Saxon.

The following claims are based on conduct alleged to have occurred after November 13, 2009, and Saxon's defenses based on the statutes of limitations are reserved:

1. Breach of contract claims contained in paragraphs 104-05 of the Complaint to the extent they arose after November 13, 2009.

2. Tortious interference with contractual relationship claims contained in paragraph 129 of the Complaint.

## ORDER

**IT IS HEREBY ORDERED** that the Motion to Dismiss [ECF No. 26] and the Motion for

Summary Judgment [ECF No. 51] (together the "Motions") are granted in part and denied in part

as follows:

A.      Tomlin failed to state a claim under 15 U.S.C. § 1681s-2 for which relief can be

granted and his claims for violation of the FCRA set forth in paragraphs 83-97 of the Complaint

are dismissed with prejudice.

B.      Tomlin's causes of action stated in paragraphs 75, 76, 78-80 (defamation), 103, 106

(breach of contract), 113, 117-21,132 (fraud), and 124 (IIED) of his Complaint are preempted by

the FCRA and are hereby dismissed with prejudice.

C.      The Defendants' Motions are reserved as to the state statutes of limitation defenses

and the parties shall have twenty-one days from the date of entry of this Memorandum Opinion

and Order in which to brief the applicability of K.R.S. § 413.320 to the asserted defenses.

D.      The BONY Defendants' Motion to Dismiss based on the affirmative defenses of

statutes of limitation is reserved with respect to the following claims pending the briefing required

by the preceding paragraph:

   1.  Defamation claims set forth in paragraph 77 of the Complaint.
   2.  Breach of contract claims set forth in paragraphs 104-05, 107-09 of the
       Complaint.
   3.  Fraud claims set forth in paragraphs 114-16 of the Complaint
   4.  Tortious interference with contractual relationship claims set forth in
       paragraphs 128-30 of the Complaint.

E.      The BONY Defendants' Motion to Dismiss is denied with respect to the following

claims:

   1.  Fraud claims set forth in paragraphs 122-23 of the Complaint.
   2.  IIED claim set forth in paragraph 125 of the Complaint.

F.      The Saxon Defendants' Motion for Summary Judgment is granted, in part, and the following claims are dismissed with prejudice as to them:

1. Defamation claims set forth in paragraph 77 of the Complaint.

2. Breach of contract claims set forth in paragraphs 99-102 of the Complaint.

3. Breach of contract claims, to the extent they occurred on or before November 13, 2009, set forth in paragraphs 104-05 of the Complaint.

4. Fraud claims set forth in paragraphs 114-16 of the Complaint.

5. Tortious interference with contractual relationships set forth in paragraphs 128 and 130 of the Complaint.

G.      The Saxon Defendants' Motion for Summary Judgment based on the statutes of limitation defenses is reserved as to the following state law claims pending the briefing required by paragraph C above:

1. Breach of contract claims set forth in paragraphs 104-05 of the Complaint to the extent the claims are based on events that occurred after November 13, 2009.

2. Tortious interference with contractual relationship claim set forth in paragraph 129 of the Complaint

**IT IS FURTHER ORDERED** that within fourteen days of entry of this Memorandum Opinion and Order, the BONY Defendants shall file a statement advising whether they consent to entry of final orders or judgment by this Court.   FED. R. BANKR. P. 7012(b).

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
**_Tracey N. Wise_**
**Bankruptcy Judge**
**Dated: Thursday, March 31, 2016**
**(tnw)**